G. W. MARQUARDT, Appellee, v. LOUIS BARTLETT, Administrator, Substituted Appellant.

**CORPORATIONS:** Transfer of Shares—False Representations—Burden of Proof—Evidence. Evidence reviewed, and held to show not only that plaintiff had failed to sustain the burden of proof to show that certain alleged false representations in the sale of corporate stock were false, but that the representations of fact actually made were true.

**CORPORATIONS:** Transfer of Stock—False Representations—Matters of Opinion. Statements in the sale of corporate stock that

a chronograph, the patents for which were owned by the corporation, was "the greatest thing in the world and would yield millions·of dollars as profits", fall far short of representations of fact.

**CORPORATIONS:** Transfer of Shares—False Representations—
3   "Promise" to Remain With Company. Plaintiff may not predicate a claim on the fact that defendant, in selling corporate stock to plaintiff, promised to remain with the company, when plaintiff's own conduct resulted in "eliminating" defendant from the concern.

*Appeal from Polk District Court.*—HUGH BRENNAN, Judge.

MONDAY, JANUARY 24, 1916.

SUIT to·cancel a contract to purchase shares of capital stock in the American Chronograph Company and recover the amount paid thereon. Defendant H. G. Sedgwick filed a counterclaim, demanding judgment for the balance of the purchase price. Both the petition and counterclaim were dismissed. H. G. Sedgwick appealed and, as he has departed this life since, the administrator of his estate has been substituted as party defendant.—*Reversed.*

*O. C. Brown,* for appellant.

·*Clinton L. Nourse,* for appellee.

LADD, J.—This action was begun April 28, 1910, to enjoin defendants from removing from Polk County the following contract, entered in a memorandum book, to cancel the same as having been obtained by fraud, and to recover the amount paid thereon, with interest:

1. CORPORATIONS: transfer of shares: false representations: burden of proof: evidence.

"Received·at the hands of Miss Maye Sedgwick certificates of stock No. 84 and 85, for seventy-five shares at $50 per share of American Chronograph Company stock, the same to be paid for by weekly payments of twenty dollars each from April 1st, 1903, to the credit of Miss Maye Sedgwick, Des Moines, Iowa, at the Marquardt Savings·Bank, until the full amount,

viz., $3,750, is paid; and the check Miss Sedgwick is to draw weekly shall be entered in the pages herein with the day, date and number thereof. Des Moines, Iowa, April 1, 1903. G. W. Marquardt.''

Payments were made accordingly until in October, 1905, aggregating $2,620, and none have been made since. The petition alleged that, to induce plaintiff to sign the above instrument, the defendant H. G. Sedgwick represented:

''(1) That he was the inventor of a device known as a chronograph, which would accurately register the speed of railroad trains, and all signals of locomotives drawing trains, whether by bell or whistle; that letters patent had been issued to him by the government and by him transferred to the American Chronograph Company issuing said stock; (2) that the usefulness and desirability of the said chronograph had been demonstrated to and by various railroad companies in the United States; and that it would accurately and readily do its work, as represented by said defendant and above set out; and that it could be cheaply manufactured; and that its usefulness and desirability had been especially proved by examination and tests made by or for the New York Central Railroad Company, one of the largest and most influential railroad companies in the United States; (3) that said chronograph company was of great value, and that he (the said Sedgwick) owned and would keep fifty-one per cent. of the capital stock of the said company at all times, in order and to the end that said company might be carefully and prudently managed, and that the stock contracted to be sold to the plaintiff and the plaintiff's interest fully protected.''

The petition further alleged the falsity of the above representations and that plaintiff was ready to return the stock upon repayment of the sums paid, and prayed for relief as stated. For answer, the defendant Sedgwick admitted the allegation of Paragraph 1 above, except that portion saying that the representations were made to induce plaintiff to enter into the contract; admitted that he represented that certain

tests or demonstrations had been made upon certain railroads and that the letters patent were of great value; but denied that these were for the purpose alleged, and denied that he undertook to retain 51% of the capital stock and admitted having disposed of the same, on the condition, however, that the transferee vote the same with plaintiff at all stockholders' meetings; and alleged that plaintiff had full knowledge concerning the patent, long before he first became a stockholder, in August, 1901. By way of counterclaim, he alleged the execution of the contract, and demanded judgment for the balance unpaid. The answer of Brown denied the allegation of the petition because of want of knowledge; but admitted having possession of the contract in Warren County; and Maye Sedgwick interposed a similar denial; alleged the assignment of the contract to H. G. Sedgwick, and that she had no interest in the litigation. In reply to the counterclaim, plaintiff interposed the defense that the execution of the contract was obtained by fraud and that the device was and is of no value, and the corporation without assets, as alleged in the petition. Defendants filed an amendment to the answer, alleging that, if any fraud was practiced, plaintiff, after ascertaining the fact, made payments, voted his stock and exercised control over the company and thereby ratified the contract, and is estopped now from claiming a rescission thereof. It thus appears that, though Sedgwick alone appeals from the judgment dismissing the counterclaim, the issues raised in the petition are involved in the defense to said counterclaim. The contract set out is presumed, in the absence of evidence to the contrary, to be valid and based on a valuable consideration, and the burden, in order to avoid payment of the balance of the purchase price, is on plaintiff, to show by a preponderance of the evidence that its execution was induced by fraudulent representation of defendant, or that it was without consideration. Letters patent on a railway chronometer were issued by the government of the United States and also by that of Canada to Sedgwick in 1898, and by him

assigned in November, 1900, to a corporation known as the American Chronograph Company, in consideration of 494 of its 500 shares of capital stock, of the face value of $50 each. Three shares each to O. C. Brown and W. S. Wallace were issued, and the three became the board of directors of the company. The company was without assets, other than these patents, as plaintiff well knew in purchasing 14 shares of stock for himself and 11 shares for his wife and daughter, in 1901, and in entering into the contract for the purchase of 75 shares in April, 1903. The record does not contain an accurate description of the device; but defendant testified:

"The machine I used on the New York Central had two clocks just alike; if one failed, the other would do the work. They moved the perforator that perforated the tape. The tape was moved by a spring below and back of the clock. All chronographs had this spring to move the tape from one spool onto the other. The clocks were self winding. The chronograph was also by attachment connected with the cross head on the engine by a rod by which it obtained the distance punch on the tape, and the time and place and whistle and bell; that was the action of the engine. A rod was attached to the bell and then to the outside of the cab and then down to the chronograph by a little crank. Another rod was attached to the whistle and to another crank that came down to the chronograph; another rod was attached to the pop. There were five rods running to the chronograph and the engineer's punch was operated by his pulling a lever whenever he wanted to record, and that made a punch. There was a line running lengthwise of the tape for each, and the clocks and springs kept the chronograph going all the time. The chronograph records the speed, the ringing of the bell, the blowing of the whistle, the number of 'toots,' the time and place are all recorded and the engineer has an individual line to record anything he desires. He has an individual punch to record anything at any time he may choose. The mechanism is not electric, it is all mechanical, and attached to the cross head

of the locomotive for the speed, and attached to the bell for recording the bell and to the whistle to record the duration of the whistle and the number of times the whistle is sounded, the time and place where the sound is made. It also records the pop valve to keep records of what is known as over firing, that is, burning too much coal, to check up the fireman who uses fuel to excess. Every time the pop valve blows it is indented in this tape, the tape moving would make a record of the length of time the pop valve blows. They know exactly what it costs per minute for a pop valve to blow and from that record could tell how long it blew and what it cost. The speed of the locomotive was shown on the tape by the revolution of the wheels from the cross head. . . . The train sheet showing the time the train arrives and leaves each station is laid down with the chronograph tape starting at the same point . . . and search down to any station between there and you will find the number of minutes between the stations. The tape was such a length as the distance requires. The distance punch operated by the cross head' made a little indentation in the tape every tenth of a mile and if you ran to a station 12 miles you would have 120 punch marks, but we did not count the punch marks. We laid the tape beside the train sheet and then compared the distance punches on the tape with the train sheet, giving us the exact speed of the train anywhere between those two stations in one-tenth of a mile. There were no punches on the train sheet, that was put in with ink. Q. If there was nothing but these punctures how could you tell where the station was? A. The engineer punched the station. Q. Then in order to tell where the station was the engineer had to reach up and pull that punch business? A. Not necessarily. When we stopped in the station you would see the slow-down in the punctures because the engine was not moving. You could see where he stopped and started up again. Q. The clock was always running? A. Yes, sir. It was self winding. Q. The clock was always making punctures of time? A. Made

punctures there that were put into it from the train sheet. Each, one of them represented one minute and each fourth one was omitted so as to count them. Q. You counted them by fours? A. Yes, sir. We had to count those punctures between stations, and that is what I mean by laying it by the train sheet; that gives the time. We counted them by fours by a glance of the eye. If we were running 60 miles an hour we would have 60 punctures; that is one way you could identify your tape; they worked together.''

This gives a general idea of the nature and design of the invention, and we may now revert to the management of the company and what was done thereunder. Sedgwick was president and general manager until June, 1903. He had entered into a contract with one Ainsworth in December, 1899, by the terms of which the latter should test the chronograph, put same on the market, pay Sedgwick a royalty of $7.50 each on all those accepted, and $10,000 when 1,000 were in use and actually performing functions for which intended. Ainsworth assigned this contract to A. W. Cole and E. C. Brown and, shortly afterwards, the device was attached to one of the engines (No. 934) of the New York Central Railway Co. and there tested under the supervision of Sedgwick for a period of six months and four days; and, according to Sedgwick, whose testimony is undisputed and rather confirmed by a letter of the general manager of the railroad, the apparatus made perfect records of the speed, signals and ''pops'' of the valve of the locomotive. But as Brown and Cole did not perform the agreement, it was forfeited by the company to which Sedgwick had assigned it. In June, 1902, the company, through Sedgwick, entered into an agreement with one Dixon, granting him the exclusive right to lease the chronographs to certain railways at 10 cents a day each and divide the proceeds with the company. Dixon was to try to organize a corporation to carry out the terms of the contract, and the device was to be tested on the Erie and other railways. It was attached to a locomotive of the Erie Railway

Co. and tested for four months and, according to the testimony of Sedgwick, undisputed and somewhat confirmed by numerous letters of the president of that company, made perfect records of what it was designed to do. Dixon does not appear to have acted under this contract, but became interested in some way in the arrangement with Edward Schofield. The latter entered into an agreement early in 1903, whereby the company granted to him the sole license to make, use, lease and rent the chronographs and pay the company $1 a year for any rented at 1 cent a day, $2 a year for those rented at 2 cents a day, and so on up in like ratio. The agreement provided that, should he assign the contract or otherwise transfer the franchise, the assignee should be informed of the contract and sign an acknowledgment thereof, a copy of which should be immediately delivered to the company. Schofield undertook to exercise due diligence to introduce and extend the use of the device, and the company undertook to furnish, on request from Schofield, "the services of a man who is familiar with the mechanism and operation of said chronographs and able to install them properly upon engines and give demonstrations of operation, and who could superintend the manufacture of the same", such person to receive $5 a day and expenses. According to Sedgwick's testimony, the apparatus had previously been tested for 2 or 3 months on a locomotive of the Chicago, Milwaukee and St. Paul Railway Company, and found to make perfect records. All this had happened prior to the sale of the 75 shares of stock on April 1, 1903, to plaintiff, and at that time, the contract with Schofield was exhibited to him. If, then, defendant represented to plaintiff that the chronograph would accurately register the speed and signals of the locomotive and that its efficiency for that purpose had been tested by leading railway companies, especially the New York Central Railway Company, what he said was true. What subsequently transpired does not prove the contrary.

Undoubtedly he was elated over the contract with Scho-

field, which promised so much, after his long struggle to
perfect and put on the market his invention, and he may
have expressed the opinion to Marquardt that
it was the greatest thing in the world, and
would yield millions as profits to the com-
pany. But these were mere opinions, as his
auditor well knew, and not representations of
any fact.  If he said to him that the chronographs could be
manufactured cheaply,—at not to exceed $7 each,—the record
does not indicate the contrary.  Sedgwick, who was a .me-
chanical and electrical engineer, and had made several of
them, testified that in quantities they could be made at $4
each.  His statement that the patent was of great value mani-
festly was but an opinion, and not a representation of fact.

2. CORPORATIONS:
transfer of
stock: false
representa-
tions: matters
of opinion.

But it is claimed that he promised to retain 51 per cent
of the stock, to the end that the company might be prudently
managed and plaintiff's interests be fully protected.  This
was merely a promise of what he would do
thereafter, and, though probably never made,
not a representation of an existing fact.  The
transfer of the stock to Marquardt left him
but 153 shares, and these have been voted at
all stockholders' meetings since by plaintiff, or as he desired,
even though, two or three years later, they were assigned to
defendant Brown.  Sedgwick doubtless had previously ex-
pressed his purpose of retaining a majority of the stock, but
scarcely would have so stated in disposing of enough to reduce
his holding below one third thereof.  In any event, there was
no misrepresentation of any existing fact, and the subse-
quent transfer to Brown wrought no injury to plaintiff.  But
if Sedgwick left the company contrary to any promise he
may have made to plaintiff, it was brought about by the latter,
and due to his ungenerous treatment.  Shortly after acquiring
the stock, he approached Eaton, who had furnished Sedgwick
$5,000 to enable him to complete and patent the device, for

3. CORPORATIONS:
transfer of
shares: false
representa-
tions: "prom-
ise" to remain
with company.

which sum he received 100 shares of stock, with the suggestion that Sedgwick be eliminated. Plaintiff testified:

"I had conversation with Dr. Eaton at a certain meeting, I thought that probably Sedgwick was not a business man and it should probably be in somebody else's hands and that it would be better if he would give up the management and somebody else take it and Dr. Eaton thought that would be better for all of us and better for Prof. Sedgwick, and he thought we ought to try it that way, and it was finally agreed that Dr. Eaton, who had long been a friend of Prof. Sedgwick's would go and talk to him and tell him frankly that was the situation. That was the substance of what I and Dr. Eaton and the other directors agreed to. Up to this time Prof. Sedgwick had been general manager of the company's affairs. We had this conversation and finally agreed that it would be better if some business man had the management in place of Prof. Sedgwick and Dr. Eaton was to talk to Prof. Sedgwick about that."

Eaton interviewed Sedgwick, and the latter may tell the story:

"About six weeks prior to this time (meeting of stockholders, June, 1903) Dr. Eaton wrote me to meet him in Oil City, Penn., where he was lecturing and I did so, and stayed all night with him. He was my lifelong friend. He baptized all my children and we were companions in the ministry together. I thought the world of him,—no friend on earth had stood by me better than he had; but he tells me now I have to get out, without any consultation with the directors, as was testified by Mr. Marquardt here yesterday, that it was decided I was not a business man, I was nothing but a preacher and I was now to step out. I had spent $4,000.00 of my own money, independent of all anybody else had spent, to get this where it was, and had given it four and a half years of the best of my life. I was about exhausted; but the victory was ours, and Dr. Eaton comes to me now and tells me I had to get out, that he would like to have me stay on

the board as a director, but the management of the company must pass into their hands.  He told me  .  .  .  that it was best for all interests that now, having won the battle, that I take a good, long rest, it would do me good, and I guess it would.  I was simply brokenhearted.  I could not and did not answer him, but told him I would take it under consideration.''

They met again, later, when he agreed to step out, but declined to be a director, and shortly afterwards, left for California.  Eaton admitted meeting Sedgwick, but testified that the withdrawal was on his (Sedgwick's) suggestion. Possibly, but not likely, so soon after the making of contracts which he evidently thought assured the fruition of all his labors.  Eaton doubtless put the matter nicely to his old friend, who caught the purport of it all and accepted the inevitable on the hint, without waiting to be kicked out.  The stockholders, at their meeting in June of that year (1903), resolved their ''cordial appreciation of the long and faithful work which he (Sedgwick) had done and for the successful issue of his labors'', but made no mention of his ill health, owing to which, Eaton testified, he left.  The plaintiff, his son, C. G. Marquardt, and defendant Brown were elected directors, who later elected plaintiff president, Brown secretary, and C. G. Marquardt treasurer and general manager of the corporation.  Plaintiff has continued as president and Brown as secretary since.  C. G. Marquardt continued as general manager, until June 6, 1906, when E. L. Eaton succeeded him and continued in that office, though the last stockholders' meeting appears to have been in 1910, and the last directors' meeting, in 1909.  In 1903, Schofield transferred his contract with the company to a corporation organized by him, known as the Railway Chronograph Company, and it required a model and a suitable person to superintend the making.  The general manager sent one of the machines made under the supervision of Sedgwick and had the Milwaukee Metal Company make two machines by comparison with the

model and blue prints furnished by defendant, but C. G. Marquardt and Eaton testified that neither would work. He then employed Beaubien, a typewriter expert, who had assisted Sedgwick and whom the latter recommended, to make another, and it proved defective. But none of these were tested save on a table, and the testimony of Sedgwick was to the effect that the motion of the engine was requisite to the steady unrolling of the tape, and he so advised by letter. The secretary proposed that Sedgwick be employed to make a new machine or make over the old one; but the manager did not want to adopt the suggestion, "because we don't think Sedgwick knew anything about it". Sedgwick had written, November 4, 1904:

"As what Beaubien says about the chronographs, I do not think he is entitled to any further credence from us in any matter whatever, and you need not pay the slightest attention to what he may say or do in the future. The chronograph known as the N. Y. C. chronograph is standard and a perfect model for the Milwaukee folks to go by. . . . If Dixon has the machine sent him, he has all he can ask; and when he is ready to install, I will be on hand and show them how to do it. Mr. Brown writes this week that Dixon wanted a chronograph, and I wrote him to send him the one I have spoken of."

E. L. Eaton testified to having the machines made; that Sedgwick furnished' the machine tested on the railroads, as recited, and added "a set of blue prints and gave them to the company at Milwaukee that was to make the standard machine, and these were the old machines rebuilt, or varied from in several particulars. I cannot tell you what the particulars are", but it was found the new machines would not work when tested on a table. One was sent to Sedgwick, who returned it, saying that it would work all right if attached to an engine. Eaton testified that it would not work on an engine or table, for that the tape would stand still a few seconds and

then jump ⅜ of an inch. On cross-examination, he admitted
that he had never seen it tested on an engine. He had this
rebuilt by Beaubien and supposed it perfect, but it proved
somewhat defective. At the stockholders' meeting in 1907, a
resolution was adopted, reciting that Sedgwick had directly
or impliedly promised the stockholders that ''he would never
withdraw either his personal or financial interest from the
chronograph; that he would faithfully devote himself to the
mechanical perfecting of the machine; and that he would use
his utmost endeavors to secure its adoption by the railroads'';
and that he had not done so; and denouncing his conduct as
equivalent to fraud and obtaining money under false pre-
tenses; and requesting ''said Hiram G. Sedgwick to return to
the service of this company and fulfill the pledges he has
made to us; that he perfect the chronograph and make it a
standard machine; that he conduct an adequate and satis-
factory test upon at least one of the principal railroads; and
that he faithfully represent the chronograph to the railroad
officials and use his utmost endeavor to secure its adoption
by such railroad''. And yet Sedgwick was advising that the
machine tested by more than a year's use and found to record
perfectly be used as a model, but the company's managers
never adopted the suggestion; he insisted that the tape would
not run evenly when tested on a table and that the motion of
the engine would accomplish this, but these managers, Mar-
quardt and Eaton, never caused to be made or witnessed a
test elsewhere than on a table. He is accused in the resolution
of abandoning the enterprise; but in fact, he was ready at
all times to render services to the company without compensa-
tion other than his actual expenses. Eaton wrote him, Novem-
ber 25, 1905, asking him to install machines on engines of
several roads and instruct mechanics how to care for them,
adding:

''Perhaps a week or ten days at each place would be
sufficient. Our directors are willing to pay your expenses both

ways and your local expenses, not to exceed $5.00 per day, while making the installations, etc. We hope you will consent to come and do this for us. Your coming to do this work for us will sweeten up everybody.''

Sedgwick responded, saying that he had proffered his services repeatedly gratuitously, and would come on the terms named, but suggested that the expense money be advanced. This proved agreeable to Eaton, and their correspondence shows conclusively Sedgwick's readiness to render services without compensation other than his expenses in building or installing or testing the machines, and that the reason he did not do as requested was the failure of the company to advance his expenses. Eaton testified:

''So far as I know, there is not a man in the company but what believes still that the thing is capable of being made a success if any mechanic will take hold of it and make it so; but, as far as we know, he is the only man on earth that can do it.''

And again:

''My idea about the chronograph is that it is a good idea. I have no objection to saying that the device is good. The only trouble in my mind was that the stockholders were afraid we did not have a correct machine, and it would not do to go and manufacture until we did. That blocks the way all the time, and was the only question. . . . I mean by saying that, the idea is a good one if we can get a machine that would do it.''

But all this does not prove the falsity of the representations of defendant, made to plaintiff in buying the stock. It tends rather to establish the inefficiency of the so-called business management, installed when the inventor was eliminated from participation in the affairs of the company. In a letter written to Brown in 1907, Eaton touches the real difficulty:

''This company can never advance one inch with its present members. Marquardt will do nothing. He is too old.

He has lost his interest and his grip. He does not believe or trust any of us. The chronograph will never breathe the breath of life as long as he controls its stock; so I propose that we go to work and get the stock, if possible, into the hands of someone who will at least try to save the wreck. . . . Yet it seems to me that we are a lot of chumps to lay down and do nothing, when we know we have a machine that will do exactly what railroads want done.''

Those in control were not ready to invest or advance the necessary expenses to accomplish anything with the invention. Whatever was done after the elimination of the inventor did not controvert what defendant claimed the device had done or would do, and neither established the falsity of Sedgwick's representations to plaintiff, nor that the patents or device were worthless.

C. G. Marquardt and Eaton testified that the defective machines made under their supervision were of no value; but as to whether the invention was of value, the record is silent. The machines so made are not shown to have been constructed exactly like the model actually tested by long use on locomotives. The so-called business management inaugurated in 1903, undertook to conduct the business practically without means, and was without that skill and business sagacity so essential to the manufacture and promotion of the use of mechanical devices. They were neither ready to accept the machine tested by actual trial on the railroads as a model nor to act on the information from Sedgwick that the machine could not be made to work accurately on a table, but must have the motion of an engine, in order to move the tape uniformly. Even those made under the ''business management'' were not subjected to this test. As said, the defendant's services were at all times at the company's command, he exacting only the payment of his expenses. The stockholders declined to advance even these, though well assured, as it seems, that the result would be such a machine

as they desired. If there was any lack of fidelity in the attitude of Sedgwick towards this company, this record is silent thereon; but it does disprove the charges of his accusers. Our conclusion is that the plaintiff's defense to the counterclaim was not proven, and judgment should have been entered thereon, as prayed.—*Reversed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.